Catherine ALISON, Administratrix of the Estate of Julian B. Alison, Deceased, Libelant,

v.

UNITED STATES of America, Respondent.

United States District Court
S. D. New York.

Feb. 20, 1957.

Sterling & Schwartz, New York City, by Benjamin B. Sterling, New York City, of counsel, for libellant.

Paul W. Williams, U. S. Atty., New York City, by Corydon E. Dunham and Maurice J. Smith, New York City, of counsel, for respondent.

EDELSTEIN, District Judge.

1. Libelant is and was the widow of Julian B. Alison and is the administratrix of the estate of Julian B. Alison, deceased, who, during his life, was a member of the crew of the S.S. "John A. Quitman", namely, its first assistant engineer.

2. The S.S. "John A. Quitman" was a merchant vessel commonly known as a Liberty ship, and at all times mentioned in the libel, was owned, manned, operated, managed and controlled by the re-

spondent, United States of America, and its representatives and agents.

3. The S.S. "John A. Quitman", having a certificate of inspection of the United States Coast Guard and other certificates required by law, fully laden with a cargo of bituminous coal, set sail from Newport News, Virginia, for Hamburg, Germany, by way of the Atlantic Ocean on or about January 29, 1952.

4. On February 15, 1952, at 5:45 o'clock p. m., the vessel, still fully laden with cargo, low in the water, starboard side to the quay, was all fast at the Kalikai (or Kali quay) pier in Hamburg, Germany.

5. The Kalikai pier (or quay) had a waterside which stretched a distance of about 1,600 feet. The pier area was 300 feet wide. An entrance to the pier area on the land side, about 600 feet from where the vessel was berthed on the water side, led to a highway area. About 100 feet across the highway area from the entrance to the pier area, a restaurant and bar, known as the "Du und Ich", was located.

6. At the time of the mooring of the vessel, because she was laden with cargo, she was low in the water. The gunwale was level with the quay. The regular ship's gangway could have been used only by rigging it from the boat deck or else by using only the lower section.

7. A temporary or provisional gangway was rigged, made up of two stagings of about 12 inches wide and about 10 or 12 feet long. These boards were nailed together by means of 1 x 2 strips of wood, commonly referred to as cleats. Three uprights, about 36 inches high, were nailed on either side of the stagings and a line was secured running from one end of the gangway to the other. The gangway was secured to the bulwark of the vessel and lines were so placed that it could not swing from one side to the other; but the shore end of the gangway was not secured, resting on the pier, and with the rise and fall of the tide, the angle of the gangway changed. As the tide fell during the evening, the gangway ran down to the ship at an acute angle. There was no ladder provided as access from the ship's end of the gangway to the deck, a distance of about four feet, nor were there any handlines or rails for use in descending to the deck. The only means of access to and from the gangway at the ship's end was a rolled-up tarpaulin.

8. On February 5, 1952, there was haze and fog, and the weather conditions were near freezing. There was snow on the quay and snow and water were tracked on the gangway.

9. On February 15, 1952 before any gangway had been rigged, one Max Stebinger, a watchman employed by Hamburger Ships and Cargo Watching, jumped from the dock on to the vessel and took over the gangway watch, at the entrance to the starboard ship's alleyway, some 40 feet forward of where the temporary gangway was later placed.

10. Max Stebinger remained at his position forward of the gangway from the time he boarded the vessel until 7:00 o'clock in the morning, taking time out only for the purpose of coffee breaks, at which time he was relieved by the officer on watch, these times not exceeding a ten minute period each.

11. In going for coffee, the said Max Stebinger entered the starboard midship alleyway, which was some distance forward of the position where he maintained his usual watch.

12. On February 15, 1952, one Heinrich Huttig was the owner of a restaurant and bar known as the "Du und Ich" which was located about 100 feet across the highway area from the entrance to the pier area of the Kali quay.

13. On February 15, 1952, Heinrich Huttig, about an hour after the vessel moored, or about 6:45 p. m., boarded the vessel. It was dark and foggy weather, with snow and frost. He boarded the vessel to draw the attention of the ship's crew to his restaurant. Julian B. Alison asked him where his tavern was located.

**310**

14. At all times during the evening of February 15 and the morning of February 16, 1952, the entire area, including the gangway was properly and adequately lighted.

15. Julian B. Alison informed the Chief Officer that he was leaving the vessel to go to a bar for a few drinks and invited him to go.

16. Julian B. Alison left the vessel on the evening of February 15, 1952, and was later seen by the owner of the "Du und Ich" in his tavern.

17. Subsequent to April 17, 1952, an autopsy was performed on a corpse found in the waters of Hamburg Harbor, which corpse was identified by the police as Julian B. Alison.

18. It was reported to Libelant that Julian B. Alison was drowned.

19. Julian B. Alison's actions and words while in the tavern indicated that he had been imbibing intoxicating drinks and was under the influence thereof.

20. Julian B. Alison was observed in the tavern "Du und Ich" at some time around 8:00 o'clock p. m. during the evening of February 15, 1952. He was also seen in the tavern between 10:00 and 11:30 o'clock p. m. of February 15, 1952.

 21. It has not been established by a fair preponderance of the credible evidence that Julian B. Alison returned to the vessel on February 15 or 16, 1952, or any other time.

22. It has not been established by a fair preponderance of the credible evidence that Julian B. Alison boarded the gangway of the S.S. "John Quitman" on the evening of February 15, 1952, nor the morning of February 16, 1952, nor any time thereafter.

23. It has not been established by a fair preponderance of the credible evidence that Julian B. Alison slipped, lost his balance or fell from the temporary gangway.

Conclusions of Law

1. This court has jurisdiction over the libelant and the respondent.

2. This court has jurisdiction over the subject matter in suit.

 3. Libelant has failed to establish any causal relation between the alleged negligence on the part of the respondent and the death of Julian B. Alison.

4. Libelant has failed to establish any causal relation between the alleged unseaworthiness of the vessel and the death of Julian B. Alison.

5. The respondent is entitled to a decree dismissing the libel on the merits.

I hereby direct that a decree be made and entered accordingly, dismissing the libel herein, on the merits.